**SO ORDERED.**

**SIGNED this 11th day of March, 2025.**



_____
Mitchell L. Herren
United States Bankruptcy Judge
_____

DESIGNATED FOR ONLINE PUBLICATION

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **IN RE:** | |
| **Samys OC, LLC,** | **Case No. 24-11166** |
| Debtor. | **Chapter 11** |
| **IN RE:** | |
| **S&O Investments, Inc.,** | **Case No. 24-11167** |
| Debtor. | **Chapter 11** |
| **IN RE:** | |
| **American Warrior Construction, Inc.,** | **Case No. 24-11168** |
| Debtor. | **Chapter 11** |

### Memorandum Opinion and Order
### Denying Applications for Engagement of Counsel

Debtors in the above-captioned cases all seek to employ Hinkle Law Firm,

LLC ("Hinkle" or the law firm) as legal counsel in their Chapter 11 bankruptcy

cases. Objections were filed to those applications, focusing on the adequacy of the law firm's required disclosures, alleged representation of adverse interests between the Debtors and the resulting conflicts of interest they could cause for the law firm, an alleged lack of the law firm's disinterestedness resulting from these adverse interests and from the law firm being paid its fees in these three cases by another debtor in a related case, and an alleged conflict of interest the law firm has because one of its attorneys, before becoming an attorney, used to work for legal counsel currently representing one of the Debtors' major creditors.

Certainly, each Debtor needs qualified counsel to lead their reorganization efforts. The Court has no doubt the counsel proposed by each Debtor is professionally qualified. But being qualified under the Bankruptcy Code is a separate issue, and after holding an evidentiary hearing the Court concludes, based on the specific facts of these cases, that the single law firm proposed as counsel does not meet the qualifications required by 11 U.S.C. § 327[1] or the conflict-of-interest standards of the Kansas Rules of Professional Conduct. The Court therefore denies the Applications for Engagement of Counsel.[2]

---

[1] Future statutory references are to the Bankruptcy Code, title 11, unless otherwise specified.

[2] Nicholas Grillot and Lora Smith appeared for the debtors. John Nemecek appeared for the U.S. Trustee. Eric Lomas, Ben Jackson, and R. Joseph Naus appeared for Cairo of Western Kansas, LLC. Counsel for Dream First Bank and the Small Business Administration appeared, but did not participate in the evidentiary hearing.

2

# I. Findings of Fact

## a. The Parties

There are multiple entities and individuals involved in or in the periphery of the current dispute, many with similar names. A brief overview of the landscape is necessary.

Amro Samy is the operator and manager of Samys OC, LLC, which has been operating for about ten years. Mr. Samy purports to own 51% of Samys OC, LLC. Samys OC, LLC operates four restaurants, employing around 280 to 290 individuals in four Kansas cities. A different entity named Cairo of Western Kansas, LLC ("Cairo") is the other co-owner of Samys OC, LLC. Cairo was itself created by Cecil O'Brate, who was the entity's principal and 100% owner. Mr. O'Brate passed away in January 2024, and Cairo is now owned by Mr. O'Brate's estate. H.J. Swender, Jr. has been the manager of Cairo since November 2019.

Mr. Samy is also the purported 51% owner of S&O Investments, Inc., with Cairo owning the remainder of this entity as well. S&O Investments, Inc. owns and operates six duplexes in Garden City, Kansas, and owns two pieces of undeveloped real property. Mr. Samy manages the six duplexes.

Another entity at issue is American Warrior Construction, Inc. This entity is 100% controlled by Mr. Samy, as either he or a trust in his name own all the shares of that entity and he is the president. American Warrior Construction, Inc. is no longer operating, other than receiving minimal income from a lease of certain equipment. In the past, American Warrior Construction, Inc. developed and acted

3

as a general contractor on many projects throughout the state of Kansas, including the restaurants now operated by Samys OC, LLC and the duplexes now managed by S&O Investments, Inc.

And finally, another entity associated with Mr. O'Brate is Debt Recovery Services, Inc. This entity is a creditor only of Mr. Samy and Mr. Samy's spouse, Darla Samy.

There are many more entities jointly owned by Mr. Samy and Mr. O'Brate's estate, in varying percentages, but they are not directly relevant to the matters currently before the Court. As discussed in more detail below, Samys OC, LLC, S&O Investments, Inc., American Warrior Construction, Inc., and Amro and Darla Samy are all Debtors in this Court.

### b. <u>**Prebankruptcy Disputes and Litigation**</u>

As often happens in litigation between business partners, the perspective of what occurred to sour Mr. Samy and Mr. O'Brate's business relationship differs. Only a brief overview of their prepetition falling out, and the litigation following, is required here. Mr. Samy contends he and Mr. O'Brate agreed in 2019 that Mr. Samy would buy Mr. O'Brate's ownership of Samys OC, LLC, but when the time came, Mr. O'Brate began "moving the goalposts." Mr. Samy alleges that eventually Mr. O'Brate and Mr. Swender began orchestrating a plan for Mr. O'Brate to take over Mr. Samy's share of the businesses and push Mr. Samy out entirely. Mr. O'Brate alleges it was Mr. Samy who would never complete their agreement regarding ownership of the businesses, and when Mr. O'Brate and Mr. Swender

4

began reviewing financial information for those businesses in 2019, they discovered false or fraudulent transactions between Mr. Samy and American Warrior Construction, Inc.

In April 2020, Cairo filed the first suit between the parties in state court. Over the next several years, the litigation between the parties grew in state court, as listed here:

| Date Filed | Relevant Parties[3] | Claims | Case Number |
|---|---|---|---|
| 4/20/2020 | Cairo v. Amro Samy, American Warrior Construction, Inc., (Nominal Defendant) Samys OC, LLC, (Nominal Defendant) S&O Investments, Inc. | Breach of fiduciary duty, fraud, negligent misrepresentation, conversion, civil conspiracy, gross mismanagement, and waste of corporate assets. | 2020-cv-0042 (the **"Unified case"**) |
| 4/24/2020 | Amro Samy, Samys OC, LLC v. Cairo | Ownership and management of one of the Samys OC, LLC restaurants. | 2020-cv-0044 (the **"Franchise case"**) |
| 7/6/2020 | Cairo v. Amro Samy, American Warrior Construction, Inc. | Negligence, breach of implied warranty, misrepresentation, breach of fiduciary duty. | 2020-cv-0069 (the **"Heritage case"**) |
| 6/18/2021 | American Warrior Construction, Inc. v. Stone Development, Inc. | Breach of contract, foreclosure of mechanic's lien, unjust enrichment | 2021-cv-0076 (the **"Mechanic's Lien case"**) |
| 7/11/2022 | Debt Recovery Services, Inc. (as Successor by Assignment to original Plaintiff First National Bank of Syracuse) v. Amro Samy, Darla Samy <br><br> Third Party claims involving Pinnacle Development, LLC | Loan default, breach of guaranty, counterclaims for wrongful set off and willful conversion, third party petition for indemnity, third party counterclaims for breach of contract, breach of fiduciary duty, and promissory estoppel. | 2022-cv-0081 (the **"Pinnacle case"**) |
| 5/18/2023 | Amro Samy v. H.J. Swender, Jr., Cairo | Breach of fiduciary duty, breach of good faith and fair dealing, breach of good faith, loyalty, and care. | 2023-cv-0048 |
| 6/9/2023 | Cairo v. Amro Samy | Breach of contract, breach of fiduciary duties. | 2023-cv-0058 |

---

[3] In many of the cases listed on this table, additional parties beyond the individuals and entities listed are or were involved. Because those additional parties are immaterial to the issues discussed in this Memorandum Opinion, for sake of brevity, these additional parties or their claims are not listed or discussed.

5

| 6/16/2023 | Cairo v. Amro Samy, American Warrior Construction, Inc., (Nominal Defendant) Samys OC, LLC | Breach of fiduciary duties, conversion, civil conspiracy, unjust enrichment, gross mismanagement, waste of corporate assets. | 2023-cv-0061 |
|---|---|---|---|
| 7/3/2023 | Samys OC, LLC v. H.J. Swender, Jr., Cairo | Breach of fiduciary duty, conversion, tortious interference. | 2023-cv-0070 |
| 10/5/2023 | Cairo v. Amro Samy, (Nominal Defendant) Samys OC, LLC | Breach of fiduciary duties. | 2023-cv-0110 |

The state court litigation in the above table was all removed to federal court and each case has been referred to this Bankruptcy Court for resolution.

The facts underlying much of the above litigation are not relevant to the matter currently under consideration, but some of the procedural aspects are. For example, because some of the claims made in the Unified case (2020-cv-0042) were derivative, Cairo named Samys OC, LLC and S&O Investments, Inc. as nominal defendants in that case. In June 2020, there was a failed mediation in the Unified case, and in September 2022, the Unified case, the Franchise case, and the Mechanic's Lien case were consolidated into one matter in state court. In the Pinnacle case, on October 24, 2024, summary judgment was granted to First National Bank of Syracuse (now known as Dream First Bank) against Amro and Darla Samy on the Bank's claims, and against the Samys on the Samys' counterclaims. Then on December 3, 2024, judgment was granted to Mr. Samy against Pinnacle Development, LLC. At some point, date unknown, First National

**6**

Bank of Syracuse/Dream First Bank assigned its judgment to Debt Recovery Services, Inc.[4]

      **c.  Debtors' Bankruptcy Petitions and the Applications to Employ**

In early November 2024, Debt Recovery Services, Inc. succeeded at attempts to garnish against accounts of Amro and Darla Samy and sought to obtain charging orders against them stemming from the judgment it obtained in the Pinnacle case. As a result, Debtors filed Chapter 11 bankruptcy petitions on November 14, 2024. Each Debtor entity at issue (Samys OC, LLC, S&O Investments, Inc., and American Warrior Construction, Inc., hereinafter the "Debtor Entities") and the individuals Amro and Darla Samy filed separate petitions. All were "quick files" due to the garnishments, and few supporting documents accompanied the petitions. Mr. Samy as either managing member or president, signed the petitions of each Debtor Entity.

In each of the four cases, the Hinkle Law Firm filed Applications for Engagement of Counsel that are nearly identical in substance.[5] At the hearing, Hinkle withdrew the Application for Engagement of Counsel in the Samys'

---

[4] Debt Recovery Services, Inc. is also the plaintiff in the first federal lawsuit between the parties, filed on August 12, 2024. Another joint entity between Mr. Samy and Mr. O'Brate entered into a loan agreement with Commerce Bank, for which both gave individual guarantees. At some point the loan went into default, and in November 2023, Commerce Bank accelerated the loan. In May 2024, Commerce Bank assigned the loan to Debt Recovery Services, Inc. Debt Recovery Services, Inc. then released the personal guaranty of Mr. O'Brate and filed a federal complaint against Amro Samy, alleging breach of his commercial guaranty (the "Federal Court litigation"). Mr. Samy filed a third-party complaint against Cairo, alleging breach of the operating agreement and breach of fiduciary duty, and seeking indemnification. This Federal Court litigation is ongoing but is currently stayed due to the bankruptcy filing of Mr. Samy.

[5] Case No. 24-11166, Doc. 8; Case No. 24-11167, Doc. 8; Case No. 24-11168, Doc. 8; Case No. 24-11169, Doc. 8.

7

individual case,[6] and only the Applications in the Debtor Entity cases remain (hereinafter, the "Applications to Employ").[7]

The Applications to Employ seek employment of counsel in the bankruptcy cases under § 327 and disclose "a pre-petition retainer from Debtor in the sum of $50,000.00 for potential fees and expenses."[8] The Applications to Employ disclose the firm's prior relationship with the Samys (described as a "prior relationship . . . representing [the Samys] . . . on a variety of matters from corporate formation, employment-law issues, debt collection, and other business and litigation-related matters"), but confirm Debtors did not owe any outstanding fees to Hinkle on the petition date.[9] The Applications to Employ also include a statement the law firm had "no connection" with any creditors "or with any other party in interest herein, their attorneys, or accountants, except as otherwise set forth above and disclosed in the attached affidavit."[10]

The Affidavits attached to the Applications to Employ affirmatively state Hinkle is disinterested and the attorneys who will appear "do not hold or represent an adverse interest to the estate."[11] Regarding simultaneous representation of the three Debtor Entities and the individual Samys, the Affidavits mention the

---

[6] A Notice of Substitution of Counsel has been filed in the Samys' individual case, Case No. 24-11169, Doc. 118, along with a Disclosure of Compensation, Doc. 119, and an Application for Engagement of Counsel, Doc. 122.
[7] Because the Applications to Employ are substantively the same, in this discussion the Court will cite only to the Application to Employ in Case No. 24-11166.
[8] Case No. 24-11166, Doc. 8 p. 4 ¶ 13. Of the prepetition retainer of $50,000, the total of $17,689 was used prior to filing, with the remainder held in trust. Id.
[9] Id. p. 3-4 ¶ 10.
[10] Id. p. 3 ¶ 9.
[11] Id. Ex. A ¶ 5.

8

simultaneous representation, but do not elaborate.[12] The Affidavits then generically state Hinkle has no disqualifying connections: "The members of the Law Firm do not have any connections with the Debtor, creditors, any party in interest, their respective attorneys and accountants, the U.S. Trustee, or any person employed in the office of the U.S. Trustee."[13] Neither the Applications to Employ, nor the attached Affidavits disclose any connections *between* the Debtors, nor do they address that any Debtor is a creditor of another Debtor.

The Applications to Employ also state that an associate at the law firm "served as a file clerk for the law firm representing Cairo."[14] The Applications to Employ go on to state the "associate attorney served in that capacity before going to law school and did not obtain any information or knowledge that would negatively impact Cairo's position. Additionally, it is not anticipated that the associate attorney will do any work on this Case."[15]

After objections to the Applications to Employ were filed by both the U.S. Trustee and Cairo, Hinkle filed a Supplemental Rule 2016 Disclosure Statement addressing the $50,000 retainer. That Supplemental Statement indicates the retainer was paid by Amro Samy to retain the law firm for the three Debtor Entities and the Samys individually. The Supplemental Statement does not specify which

---

[12] *Id.* Ex. A ¶ 3 ("[In addition to Samys OC, LLC,] Hinkle Law Firm, LLC also seeks to represent the Samys, along with two other related entities, American Warrior Construction, Inc., and S & O Investments, Inc., in companion Chapter 11 proceedings and seeks employment as counsel for the Samys, American Warrior Construction, Inc., and S & O Investments, Inc. in addition to [Samys OC, LLC].").
[13] *Id.* Ex. A ¶ 6.
[14] *Id.* p. 4 ¶ 11.
[15] *Id.*

9

Debtor incurred what portion of the retainer amount that was used to pay the firm prepetition.

After the evidentiary hearing on the Applications to Employ, Hinkle filed Amended Affidavits.[16] The Amended Affidavits supplement the Applications to Employ regarding the $50,000 retainer, stating the funds were wired to the law firm from First State Bank of Healy via conduit through First National Bank of Hutchinson. Mr. Samy drew the funds from a line of credit he maintains at First State Bank of Healy. The Amended Affidavits also expand on the circumstances surrounding the associate at Hinkle who previously worked for the law firm representing Cairo, discussed in more detail below.

---

[16] Amended Affidavits were filed by both Mr. Grilllot and Ms. Smith of the law firm. The Court will hereafter refer to both Amended Affidavits jointly, as the "Amended Affidavits." Like above, the Court will cite to the Amended Affidavits filed in Case No. 24-11166 for ease. Any additional information detailed in the Amended Affidavits was also testified to at the evidentiary hearing.

Other than minor typographical errors that are corrected in Ms. Smith's Amended Affidavit, the differences between the Amended Affidavits from each attorney are subtle. *See* Case No. 24-11166 Doc. 105 (Amended Affidavit of Nicholas R. Grillot), Doc. 108 (Amended Affidavit of Lora J. Smith). For example, Mr. Grillot's Amended Affidavit states: "During her employment at [Jackson Legal Group], Stevens was exposed to pleadings and files related to [the Unified case]. She was also exposed to litigation in which American Warrior, Inc., owned by Cecil O'Brate, had brought third-party claims against several parties, including Black Stone Minerals Company, L.P. and Entech Enterprises, LLC who were represented by the Hinkle Law Firm, LLC." *Id.* Doc. 105 p. 5 ¶ 33. Ms. Smith's Amended Affidavit includes only the second half of that statement, as follows: "During her employment at [Jackson Legal Group], Stevens was exposed to litigation in which American Warrior, Inc., owned by Cecil O'Brate, had brought third-party claims against several parties, including Black Stone Minerals Company, L.P. and Entech Enterprises, LLC who were represented by the Hinkle Law Firm, LLC." *Id.* Doc. 108 p. 5 ¶ 33. The Amended Affidavit from Ms. Smith then has an additional paragraph that states: "[Jackson Legal Group] has since supplied evidence that Stevens was exposed to pleadings and files related to [the Unified case] during her employment at [Jackson Legal Group]." *Id.* Doc. 108 p. 6 ¶ 40. The Amended Affidavit from Ms. Smith also indicates Ms. Smith "did not personally participate in the inquiry to Stevens" but "inquired of co-counsel, Nicholas Grillot, if the potential conflict with Stevens had been cleared" and had been advised of the details contained within the Amended Affidavit as to Ms. Stevens. *Id.* Doc. 108 p. 5 ¶ 38.

### d. **Debtors' Intercompany Transfers**

About a month after the initial petitions and Applications to Employ were filed, on December 13, 2024, all Debtors filed their Schedules, Statement of Financial Affairs, and related documents.[17] The following transfers between the Debtor Entities were disclosed:

- During the one-year period prior to filing its petition, Samys OC, LLC made payments of $92,949.34 to American Warrior Construction, Inc.[18]

- S&O Investments, Inc. disclosed a general unsecured claim held by American Warrior Construction, Inc. of $207,176.72.[19] During the one-year period preceding its bankruptcy petition, S&O Investments, Inc. made $70,624.17 in payments to American Warrior Construction, Inc.[20]

Samys OC, LLC and S&O Investments, Inc. did not disclose any money owed to the other and disclosed no payments to the other in the year leading up to the bankruptcy petitions.[21]

---

[17] Additional Amended Schedules were filed on January 23, 2025, in the Individual Samys' case but none of the amendments therein are pertinent to the matters now under consideration.

[18] Case No. 24-11166, Doc. 69 p. 67 (Statement of Financial Affairs ¶ 4.2) and p. 102 (Samys OC, LLC Vendor QuickReport January 1, 2023 through December 10, 2024 to "American Warrior Construction Company").

[19] Case No. 24-11167, Doc. 59 p. 17 (Schedule E/F ¶ 3.2).

[20] *Id.* p. 25 (Statement of Financial Affairs ¶ 4.2) and p. 27 (S & O Investments Inc. Vendor QuickReport January 1, 2023 through December 10, 2024 to "American Warrior Construction").

[21] The Schedules and Statement of Financial Affairs also show multiple transfers between a Debtor Entity and the Samys individually.

Regarding Samys OC, LLC, the following transfers are disclosed: Samys OC, LLC owes the Samys $440,898.26, Case No. 24-11169, Doc 66 p. 8 (Schedule A/B ¶ 30), and Samys OC, LLC is owed $341,632.64 from Mr. Samy, Case No. 24-11166, Doc. 69 p. 6 (Schedule A/B ¶ 71). The Schedule E/F of Samys OC, LLC also states Mr. Samy has a general unsecured claim against Samys OC, LLC in an unknown amount, *Id.* Doc. 69 p. 48 (Schedule E/F ¶ 3.247). In the one-year prepetition, Mr. Samy transferred $915,898.26 to Samys OC, LLC, Case No 24-11169, Doc. 66 p. 44 (Statement of Financial Affairs ¶ 7) and p. 46 (Samys OC LLC Transactions by Account As of December 13, 2024 for "2801- N/P Samy"). During the one-year period prior to filing its petition, Samys OC, LLC disclosed payments of $475,000 to Mr. Samy, Case No. 24-11166, Doc. 69 p. 67 (Statement of Financial Affairs ¶ 4.1) and p. 104 (Samys OC, LLC Vendor QuickReport January 1, 2023 through December 10, 2024 to Amro Samy).

The intercompany or interdebtor transfers were not disclosed within the Applications to Employ or their attached Affidavits. Each was discussed at the evidentiary hearing, however, and they are disclosed in the Amended Affidavits filed post-hearing.

As noted, Mr. Samy testified about the above transactions. First, as to any alleged loan or payment made thereon, there are no loan documents memorializing the loans, nor any assets pledged as security for the loans.

Regarding the payments made from Samys OC, LLC to American Warrior Construction, Inc., Mr. Samy testified the payments were for repair and construction work on the four Samys OC, LLC restaurant locations. He also contends payments were made from Samys OC, LLC to American Warrior Construction, Inc. for the share of the entity's payment of premiums for a life insurance policy assigned to Dream First Bank as collateral for the debt of Samys OC, LLC, S&O Investments, Inc., and American Warrior Construction, Inc.[22] Mr.

---

Regarding American Warrior Construction, Inc., the following transfers are disclosed: The Schedules of the Samys state American Warrior Construction, Inc. owes the Samys $506,868.25, Case No. 24-11169, Doc. 66 p. 8 (Schedule A/B ¶ 30). The Schedules of American Warrior Construction, Inc. disclose Mr. Samy has a general unsecured claim, but for $522,143.25, Case No. 24-11168, Doc. 58 p. 15 (Schedule E/F ¶ 3.14). In the one-year prepetition period, Mr. Samy transferred $560,000 to American Warrior Construction, Inc., Case No. 24-11169, Doc. 66 p. 44 (Statement of Financial Affairs ¶ 7) and p. 45 (American Warrior Construction Inc. Transactions by Account As of December 13, 2024 for "N/P Samy"). In the one-year prepetition, American Warrior Construction, Inc. transferred $100,000 to Mr. Samy, 24-11168 Doc. 28 p. 22 (Statement of Financial Affairs ¶ 4.1).

[22] Cairo contends American Warrior Construction, Inc. should solely be paying the life insurance premiums, and disputes Ms. Samy's contention he had an agreement with Mr. O'Brate for the payment of the premium to be split amongst all the loans held by Mr. Samy and Mr. O'Brate. Cairo also challenges Debtors' Exhibit 14, purporting to show all intercompany payments between the Debtor Entities; namely that the memorandum information included within that Exhibit describing the payment was added as preparation for the evidentiary hearing, not contemporaneously in the QuickBooks program. The Court need not resolve either dispute. Debtors admit and acknowledge the intercompany transfers occurred. For the purposes of this hearing, that is sufficient.

12

Samy testified that although Samys OC, LLC did not owe any money to American Warrior Construction, Inc. on the petition date, American Warrior Construction, Inc. had loaned money to Samys OC, LLC in the past, last occurring in 2018.

Regarding the claim between S&O Investments, Inc. and American Warrior Construction, Inc., Mr. Samy testified S&O Investments, Inc. owed American Warrior Construction, Inc. for work performed on the duplexes. He testified the payments made were for that work and for miscellaneous repair work.

After filing their petitions, each Debtor filed a motion for procedural consolidation and joint administration of the three Debtor Entities and the individual case of the Samys. In those motions, it states:

> [B]ecause Debtors have many of the same debts, own property that is pledged as collateral for other debts, and rely on each other's income to pay regular expenses; the Debtors and Debtors' counsel believe that there will be no conflicts for the joint representation by Hinkle Law Firm LLC of all entities. Additionally, because they share some of similar assets and some of the same debts, there were loans and obligations that were owed between some of the Debtors. However, Debtors have agreed to forgo any collection on any such debt and waive recovery on those prepetition obligations to the extent it is necessary to obtain joint administration.[23]

Cairo objected to the motions for joint administration, which remain pending, although Hinkle indicated the motion would be withdrawn in the Samys' individual case.

The primary secured creditor identified for each Debtor Entity is Dream First Bank. Samys OC, LLC owes Dream First Bank $8,340,638.78, S&O Investments, Inc. owes Dream First Bank $1,988,673.73, and American Warrior Construction,

---

[23] 24-11166, Doc. 23 p. 5-6 ¶ 12.

13

Inc. owes Dream First Bank $251,000.66.[24] Each Debtor Entity pledged all their assets as collateral to Dream First Bank[25] and Mr. Samy personally guaranteed all this debt.[26] Cairo also guaranteed the debt of Samys OC, LLC and S&O Investments, Inc.

     e. **Hinkle Law Firm Associate Attorney**

Beginning in May 2019 and continuing through January 2021, Makaela Stevens, a college student at the time, worked for Jackson Legal Group during her breaks from school. Jackson Legal Group is a law firm consisting of two attorneys: Ashley Jackson and Ben Jackson. Mr. Jackson began representing Mr. O'Brate, or his entities, in 2015.

While Ms. Stevens was employed at Jackson Legal Group, she was present for attorney-client privileged discussions between the Jacksons and their clients. When she worked there that firm's clients included Mr. O'Brate, Cairo, and three O'Brate entities involved in oil and gas production.

Over the summer of 2020, Ms. Stevens was present for conversations between Mr. Swender and Mr. Jackson regarding Cairo and its litigation with Mr. Samy or his entities. Both the Unified case and the Franchise case had just been filed in state court a couple of months prior to Ms. Stevens's summer employment, and both

---

[24] All numbers are approximate and calculated as of the petition date.
[25] The loans are cross-collateralized and contain cross-default provisions. As noted above, Mr. Samy testified Dream First Bank required a $10,000,000 term-life insurance policy on his life as security for the debt owed by the Debtor Entities. The termination of the policy for non-payment is a default under the loan documents with Dream First Bank.
[26] Mr. Samy not only guaranteed the debts of the Debtor Entities to Dream First Bank, he also guaranteed debts of other entities in which he has an ownership interest. The total debt Mr. Samy guaranteed to Dream First Bank is $21,553,788.24.

14

Mr. Swender and Mr. Jackson testified Ms. Stevens was extensively involved in strategy meetings and all aspects of the litigation then ongoing between Cairo, Mr. Samy, and American Warrior Construction, Inc. Although she was still a college student and had not yet begun law school, Mr. Jackson said his firm made an effort to expose Ms. Stevens to as much of their practice as possible, including client strategy meetings, to assist her in deciding if a career in law was something she desired to pursue. Mr. Swender interacted with her often via email and in person and considered her a part of his legal team. Ms. Stevens helped the lawyers and client prepare for the mediation that occurred in the summer of 2020 in the Unified case (which involved Mr. Samy, American Warrior Construction, Inc., Samys OC, LLC, and S&O Investments, Inc.), attended the mediation, and was present for conversations with the client and mediator.[27]

Ms. Stevens attended law school and was hired by Hinkle as a summer intern for the summer of 2023. At the time, the law firm represented two entities in state court litigation against certain O'Brate entities involved in oil and gas production, which the parties refer to as the Foundation litigation. Prior to Ms. Stevens

---

[27] In addition to the testimony of Mr. Jackson and Mr. Swender, the Court admitted into evidence from Cairo showing Ms. Stevens was: involved in preparation for the mediation of the Unified case, *see* Cairo Ex. F p. 49 (email from Ms. Jackson to Ms. Stevens, dated June 2, 2020); included on the email submission of Cairo's confidential mediation statement, *Id.* p. 53 (email from Mr. Jackson, dated June 5, 2020); invited to attend a mediation strategy meeting (email from Mr. Jackson to Ms. Stevens and others, dated June 6, 2020); and traveled with Mr. Jackson to the mediation, *Id.* p. 50 (email from Mr. Jackson to Mr. Swender and others, dated June 3, 2020). Ms. Stevens also made several spreadsheets to be used by Jackson Legal Group: a spreadsheet of information related to Mr. Samy and American Warrior Construction, Inc., *Id.* p. 51 (email from Ms. Jackson to Mr. Jackson, Ms. Stevens and others, dated June 3, 2020); a spreadsheet related to "Bank Statements OC," *Id.* p. 55 (emails between Ms. Stevens and Mr. Jackson, dated June 17, 2020); a "2019 P&L Summary" that Jackson Legal Group considered using in its mediation, *Id.* p. 52 (email from Ms. Stevens to Ms. Jackson, dated June 4, 2020); and a "Samys OC Payments Spreadsheet," *Id.* p. 56 (email from Ms. Stevens to the Jacksons, dated June 23, 2020).

15

beginning work with Hinkle, that law firm, the Jackson Legal Group, Mr. O'Brate, individually and on behalf of his oil and gas businesses involved, and Mr. Swender, "individually and on behalf of the O'Brate L.L.C. entities," signed a "Waiver of Conflict of Interest."[28]

The signed waiver explicitly waived any potential conflict of interest incurred by Hinkle in the Foundation litigation via the hiring of Ms. Stevens. In addition, and relevant here, in the explanatory section of the letter, the following agreement was set forth:

> In addition to the above, Hinkle acknowledges that, during her time at Jackson Legal, Ms. Stevens may have been involved in client discussions related to the following (the "O'Brate Parties"):
>
> Cecil O'Brate
> . . .
> Cairo of Western Kansas, LLC
> . . .
>
> Because of this, during Ms. Stevens' employment at Hinkle, Hinkle agrees that prior to undertaking representation in manner [sic] where it will be adverse to one of the O'Brate Parties and which pertains to issues for which Ms. Stevens obtained knowledge during her time at Jackson Legal that would potentially be prejudicial to such O'Brate Parties, Hinkle will obtain a waiver of conflicts from such O'Brate Parties. It is further provided, though, that all parties to this waiver agree nothing about Ms. Stevens' employment at Hinkle precludes, prevents, or serves to disqualify either firm from future representation of matters involving the O'Brate Parties if the matter pertains to issues for which Ms. Stevens, during her time at Jackson Legal, obtained no knowledge that would potentially be prejudicial to such O'Brate Parties in the matter, or if Ms. Stevens is no longer employed at Hinkle at the time of such representation.[29]

---

[28] Debtors' Ex. 1. Cairo also submitted the Letter Agreement as an Exhibit and it was admitted into evidence as Cairo's Exhibit A as well. For ease, the Court cites Debtors' Exhibit in this Memorandum Opinion.
[29] Debtors' Ex. 1 p. 2.

16

The parties refer to this as the "Letter Agreement."

Ms. Stevens became a licensed attorney and was ultimately hired by Hinkle for full-time employment as an associate attorney in August 2024, where she remains employed by the firm.

Counsel for Hinkle testified that when he became aware of the Letter Agreement, he questioned Ms. Stevens about whether she had any knowledge of issues for which the law firm would be representing the Samys and their entities. Although counsel for Hinkle testified Ms. Stevens reported she had no knowledge regarding the Samys or their entities, the testimony of Mr. Jackson and Mr. Swender showed she was exposed to legal matters with Cairo against Mr. Samy and the Debtor Entities.[30] Neither prior to filing its Applications to Employ, nor at any time since, has Hinkle attempted to obtain a waiver of conflicts from Cairo due to the law firm's employment of Ms. Stevens, other than the prior waiver related to the Foundation litigation.

## II. __Conclusions of Law__

### a. __Jurisdiction__

This is a core proceeding regarding administration of these Debtors' bankruptcy estates, arising under title 11, over which this Court has subject matter jurisdiction.[31] Venue is proper in this District.[32]

---

[30] Ms. Stevens did not attend or testify at the hearing, and Debtors did not offer evidence to refute the detailed testimony and evidence offered by Cairo of Ms. Stevens's involvement in and exposure to confidential matters concerning Cairo in its litigation with Mr. Samy and his entities.
[31] 28 U.S.C. §§ 1334(b), 157(a), (b)(1) and (b)(2)(A), and Amended Order of Reference, D. Kan. S.O. 13-1.
[32] 28 U.S.C. § 1409(a).

17

### b.  Burden of Proof

As discussed below, to be employed counsel must be qualified under § 327 and Federal Rule of Bankruptcy Procedure 2014.[33] The party opposing qualification has the burden to present a prima facie case there is evidence sufficient to warrant disqualification: a preponderance of evidence "the standards of § 327(a) and Rule 2014 have been compromised."[34] "The ultimate burden of proof, however, lies with the attorney or firm whose disqualification is sought."[35]

### c.  Overview of the Law and Parties' Current Disputes

The Bankruptcy Code contains an extensive, detailed set of guidelines for the employment and compensation of attorneys for a debtor in bankruptcy. The overarching principle is that to be compensated, the attorney must be employed, and to be employed, the attorney must meet a handful of requirements imposed by the Code.[36] Because of the withdrawal of Hinkle's application for employment in the

---

[33] In addition to being qualified under § 327 and Rule 2014, a bankruptcy court may also exercise its discretion to best serve the objectives of the bankruptcy system in employment decisions. *In re Harold & Williams Devel. Co.*, 977 F.2d 906, 910 (4th Cir. 1992) ("[O]nce the trustee meets the burden of demonstrating that an applicant for professional employment is qualified under § 327, the discretion of the bankruptcy court must be exercised in a way that it believes best serves the objectives of the bankruptcy system.").

[34] *Manchester v. Kretchmar (In re Kretchmar)*, No. 16-14337-JDL, Adv. No. 17-01026-JDL, 2019 WL 2612731, at *2 (Bankr. W.D. Okla. June 25, 2019).

[35] *Id. See also In re Interwest Bus. Equip., Inc.*, 23 F.3d 311, 318 (10th Cir. 1994) ("An applicant under § 327(a) has the burden of establishing by application and accompanying affidavit that its chosen professional is qualified.").

[36] As noted, after employment comes the second consideration: compensation. A "professional person employed under section 327" may be awarded "reasonable compensation" for services rendered and "actual, necessary expenses" under § 330. Under § 331, attorneys employed under § 327 "may apply to the court" for compensation for services rendered, but there are timing requirements. Section 331 permits the filing of an application "not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits." This District has enacted D. Kan. LBR 2016.1 to exercise the authority given by § 331 to permit more frequent applications for compensation. Under D. Kan. LBR 2016.1, a professional employed under § 327 in a Chapter 11 case may file a "motion for monthly payment of fees and expenses." The motion may request payment of

individual Samys' case, the Court is only addressing the employment of counsel for the three Debtor Entities.

As noted, § 327 governs employment of professionals, and it states, in pertinent part:

> (a) Except as otherwise provided in this section, the trustee,[37] with the court's approval, may employ one or more attorneys . . . that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.
> . . .
> (c) In a case under chapter . . . 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

Therefore, under subsection (a), the attorney must have court approval for his or her employment, must not "hold or represent an interest adverse to the estate," and must be disinterested. Under subsection (c), prior or current representation of a creditor of the debtor is not a disqualifying event, even if there is an objection, as long as there is no "actual conflict of interest."

Only one of those statutory requirements from § 327 is a defined term: disinterestedness. Per the Code, the term "disinterested person" is a person that "(A) is not a creditor, an equity security holder, or an insider; (B) is not and was not

---

100% of fees and expenses, but no less than 10% must be held back in trust pending court approval of an interim or final fee application. Compensation under § 330 is not currently at issue. Debtors have filed motions for monthly compensation under D. Kan. LBR 2016.1, but those motions are being held for decision until after the issue of employment is decided.

[37] Per § 1107(a), a debtor in possession in a Chapter 11 case "shall perform all the functions and duties" of a trustee.

. . . a director, officer, or employee of the debtor; and (C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason."[38]

The mechanics of employment are then governed by Federal Rule of Bankruptcy Procedure 2014. Per Rule 2014(a)(1), the attorney must file an application seeking employment. As contested here, the application must "state specific facts showing" all the attorney's "connections" with the debtor, creditors, and "any other party in interest."[39] The attorney must also submit a verified statement setting forth these connections.[40] Under D. Kan. LBR 2014.1, if any new material information relating to employment is discovered, a supplemental affidavit must be promptly filed.

In addition to the requirements imposed by the Bankruptcy Code, lawyers in this District must also abide the Kansas Rules of Professional Conduct ("KRPC").[41] The Kansas Rules of Professional Conduct applicable to this matter include KRPC Rule 1.9(a), which states: "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent,

---

[38] § 101(14).
[39] Rule 2014(a)(2).
[40] Rule 2014(a)(3).
[41] Under D. Kan. LBR 2090.2, Rule 83.6.1 of the United States District Court for the District of Kansas applies to attorneys in this Court. Under Rule 83.6.1(a), the Kansas Rules of Professional Conduct are adopted as the applicable standards of professional conduct.

20

confirmed in writing." Also applicable here is KRPC Rule 1.10(a), which states: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm."

The parties have narrowed their dispute to the adequacy of disclosures of Hinkle under Rule 2014, adverse interests, disinterestedness, and a conflict of interest under § 327, and a conflict of interest under the KRPC arising from Ms. Stevens's employment at the law firm.

### d. **Rule 2014 Disclosures**

Initially, the U.S. Trustee and Cairo objected to the disclosures made in the Applications to Employ and the Affidavit supporting them based on the lack of disclosure of intercompany debt and payments. Cairo also objected based on the lack of disclosure of the Letter Agreement and the full scope of Ms. Stevens's connection to Cairo and Mr. O'Brate. The Amended Affidavits summarize and disclose the intercompany transfers disclosed in the Schedules and Statements of Financial Affairs filed in each case and discussed at the evidentiary hearing, and the circumstances surrounding the Letter Agreement that were testified to at length.

At the evidentiary hearing the U.S. Trustee withdrew its objection under Rule 2014, satisfied by the supplemented disclosure via the Amended Affidavits.

Cairo maintains its Rule 2014 objection, arguing the Amended Affidavits were not filed until after the evidentiary hearing and were not exchanged as exhibits prior to the hearing.

As noted above, the primary purpose of Rule 2014 is disclosure: ensuring the parties and the bankruptcy court have adequate information to assess an application for employment of counsel. The Rule 2014 disclosure is what enables this Court to "evaluate fully" the attorney's employment under § 327(a).[42]

To fulfill the duty imposed by Rule 2014, an "attorney has a duty to fully disclose any connections with the debtor or creditors that might create a possible conflict, and all fee arrangements with the debtor in possession."[43] To comply with Rule 2014, proposed counsel for the debtor maintains a "duty to disclose any actual or potential conflicts of interest with the estate."[44] The affidavit in support of an application to employ must contain "specific facts" that enable the Court to rule out conflicts.[45] And this Court's Local Rule requires "prompt" supplementation after "learning of any additional material information."[46]

There is no question the original Affidavits filed with the Applications to Employ were insufficient regarding the intercompany relationships. The Affidavits did not address the connections between the Debtor Entities: that both Samys OC, LLC and S&O Investments, Inc. had made prepetition payments to American

---

[42] *In re Smitty's Truck Stop, Inc.*, 210 B.R. 844, 850 (10th Cir. BAP 1997).
[43] *Id.* (citing *In re Interwest Bus. Equip., Inc.*, 23 F.3d 311, 316 (10th Cir. 1994)). The penalty for the failure to disclose connections can be steep: "Failure to disclose connections that have the potential for creating a conflict warrants a denial of all compensation to debtor's counsel." *Id.*
[44] *Id.*
[45] *In re Interwest Bus. Equip., Inc.*, 23 F.3d at 318.
[46] D. Kan. LBR 2014.1(a).

22

Warrior Construction, Inc., or that American Warrior Construction, Inc. had a general unsecured claim against S&O Investments, Inc. But the Court disagrees the law firm did not adequately disclose Ms. Stevens's presence at the firm or the potential connection to the creditor Cairo. The firm expressly disclosed Ms. Stevens's employment and her prior connection with Jackson Legal Group. The disclosure of the connection is all that is required.

Regardless, the supplemented facts provided in the Amended Affidavits disclose all known connections between the Debtor Entities. They detail which entity has a claim against another entity, and prepetition payments made on those claims. Cairo argues this Court should not consider the Amended Affidavits, but the additions were the topic of testimony at the evidentiary hearing, and Cairo had ample opportunity to explore them. Ultimately, the Court concludes it is not necessary to rule on whether the Amended Affidavits should be allowed due to the Court's rulings regarding the other challenges to the Applications to Employ, which render the disclosure issue moot.[47]

### e. Adverse Interests and Disinterestedness under § 327(a)

As noted above, § 327 can present multiple hurdles to employment of counsel. Under § 327(a), Hinkle must neither hold nor represent an interest adverse to the Debtor Entities' bankruptcy estates and be disinterested. The basis for these

---

[47] The Court would not typically consider the Amended Affidavits due to their failure to be exchanged in accordance with D. Kan. LBR 9072.1 and this Court's General Order on Dockets, Hearings, and Trials. But again, based on the rulings below, the disclosure issue is moot.

23

hurdles is found in an attorney's broad fiduciary duties on behalf of a bankruptcy estate:

> Because of the unique nature of the bankruptcy estate, the debtor in possession is considered a fiduciary of that estate. For the same reason, courts have imposed a fiduciary duty upon counsel for the debtor in possession. This duty requires the attorney to exercise independent professional judgment on behalf of the estate.[48]

The Court first addresses § 327(a)'s prohibition against holding or representing an interest adverse to the Debtor Entities' bankruptcy estates. An "interest adverse to the estate" is not defined in the Code. Numerous bankruptcy courts, including the Tenth Circuit BAP, have adopted the definition laid out in *In re Roberts* for that phrase,[49] as follows:

> *Roberts* defined "hold an interest adverse to the estate" as follows:
>
> > (1) to possess or assert any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant; or (2) to possess a predisposition under circumstances that render such a bias against the estate.
>
> *Roberts* defined "represent an adverse interest" as "to serve as agent or attorney for any individual or entity holding such an adverse interest."[50]

This Court must therefore examine the economic interests of each Debtor Entity to determine if that entity has an actual or potential dispute against or with another Debtor Entity as rival claimant. A mere plausibility "'the representation of another

---

[48] *In re Smitty's Truck Stop, Inc.*, 210 B.R. at 850-51.

[49] *See In re Cook*, 223 B.R. 782, 789 (10th Cir. BAP 1998) (relying on definitions provided by *In re Roberts*, 46 B.R. 815 (Bankr. D. Utah 1985), *aff'd in part and rev'd in part on other grounds*, 75 B.R. 402 (D. Utah 1987) (en banc)).

[50] *In re 7677 E. Berry Ave. Assocs., L.P.*, 419 B.R. 833, 841-42 (Bankr. D. Colo. 2009) (quoting *In re Roberts*, 46 B.R. at 827).

24

interest may cause the debtor's attorneys to act any differently than they would without that other representation'" causes the conclusion there is an interest adverse to the estate.[51]

Regarding disinterestedness, to be disinterested, Hinkle cannot be a creditor and cannot "have an interest materially adverse to the interest of the estate."[52] In the Tenth Circuit, the disinterestedness requirement excludes an attorney "with some interest or relationship that would even faintly color the independence and impartial attitude required by the Code and Bankruptcy Rules."[53]

The Tenth Circuit in *In re Interwest Business Equipment, Inc.*[54] affirmed the bankruptcy court's denial of a single firm's application for employment of inter-related debtors who had inter-company debt, based on facts very similar to those at hand. In *Interwest* there were four bankruptcy estates at issue: one for an individual, and then three additional for debtor entities, of which that individual was an officer, director, or controlling shareholder.[55] Like in this case, the individual had separate counsel, but the three debtor entities were seeking employment of a single law firm as counsel.[56] There were intercompany debts between the debtor entities for payments due between them, and two of the debtor entities had a management contract between them.[57]

---

[51] *In re Git-N-Go, Inc.*, 321 B.R. 54, 58 (Bankr. N.D. Okla. 2004) (quoting *In re The Leslie Fay Cos.*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994)).
[52] § 101(14).
[53] *In re Cook*, 223 B.R. at 789.
[54] 23 F.3d 311 (10th Cir. 1994).
[55] *Id.* at 313.
[56] *Id.*
[57] *Id.* at 313-14.

25

The Tenth Circuit, affirming the bankruptcy court's conclusion a single law firm could not provide "sufficient scrutiny" of the relationships between the debtor entities at issue to "satisfy the fiduciary duty" of the proposed counsel to each estate,[58] noted the following issues that are also relevant herein:

> "A trustee must examine payments the debtor made prior to filing. The trustee must examine the debtor's treatment of insiders within one year of the filing. . . . The trustee must examine claims of creditors and, if a purpose would be served, object to allowance of claims.
>
> [W]e find fully supported the bankruptcy judge's conclusion '[i]t would be an impossible task for applicants to undertake this multiple representation and make decisions for one of these debtors which would not be at the expense of another.'"[59]

Like the Tenth Circuit in *Interwest*, this Court must determine if there is "a conflicting interest" that would affect the performance of Hinkle's services, or "impair the high degree of impartiality and detached judgment expected of them during the administration of a case."[60]

The claims the Debtor Entities have against the other are not small matters. The intercompany loans between the corporate debtors create a debtor-creditor relationship that would necessarily require the law firm to represent interests adverse to each estate.[61] The Tenth Circuit held in *Interwest* that the "existence of a prepetition debt from one estate to the other" is itself a "disqualifying conflict of

---

[58] *Id.* at 318.
[59] *Id.* at 318-19.
[60] *In re Amdura Corp.*, 121 B.R. 862, 865 (Bankr. D. Colo. 1990) (internal quotation omitted).
[61] *See, e.g.*, § 547 (governing preferences), § 548 (governing fraudulent transfers), § 553 (governing setoff), § 704(a)(5) (requiring examination of claims and "if a purpose would be served," objection to claims).

26

interest."[62] The Debtor Entities' Schedules show Samys OC, LLC and S&O Investments, Inc. made significant prepetition payments to American Warrior Construction, Inc., and that American Warrior Construction, Inc. has a large unsecured claim against S&O Investments, Inc.[63] There are no loan documents supporting the claims, and no written agreements of any kind detailing those loans or payments thereon, so Hinkle would have to rely solely on Mr. Samy's recollection of the transactions. Essentially, the law firm would be required to both prosecute and defend any claims the Debtor Entities have against one another. Such "interlocking interests" are the type that "can only be served by utilizing separate counsel who can fairly and fully advise each debtor as to its rights and responsibilities."[64]

Hinkle notes the intercompany debt addressed above is unsecured and states it is the result of "ordinary course operations."[65] And the testimony at the evidentiary hearing from Mr. Samy indicated he will argue much of the debt and payments thereon are related to legitimate construction or repair work performed by one Debtor Entity for another, or shared responsibilities for payment on a life

---

[62] *In re Interwest Bus. Equip., Inc.*, 23 F.3d at 314. That said, the Court recognizes there are no bright line rules. *See, e.g.*, *In re 7677 E. Berry Ave. Assocs., L.P.*, 419 B.R. 833, 844 (Bankr. D. Colo. 2009) ("the existence of inter-debtor claims does not create a *per se* prohibition of counsel representing both estates").

[63] In addition, the claims in the Unified case include breach of contract claims by Samys OC, LLC and S&O Investments, Inc. as nominal defendants against American Warrior Construction, Inc. Those derivative claims are now property of the Samys OC, LLC and S&O Investments, Inc. estates. *See Delgado Oil Co. v. Torres*, 785 F.2d 857, 860 (10th Cir. 1986) ("The § 541 estate, thus, includes any right of action the debtor corporation may have to recover damages for misconduct, mismanagement, or neglect of duty by a corporate officer or director. The trustee in bankruptcy succeeds to that right. Its nature is derivative.").

[64] *In re Interwest Bus. Equip., Inc.*, 23 F.3d at 314.

[65] Debtor's Brief in Support of Application to Employ Hinkle Law Firm, filed as Doc. 95 in Case No. 24-11166, at p. 14. The parties filed Trial Briefs in each Debtors' case.

insurance premium. However, others with ownership interests in the Debtor Entities question or dispute at least some of these claims by Mr. Samy.

Hinkle also argues the Debtor Entities' interests are not adverse but are aligned, given the significant overlap of creditors in each of the cases with the majority creditor Dream First Bank, and each Debtor Entity's desire to "marshal their assets and pay the joint obligations owed."[66] But the merits of the transfers and the reorganization plans of the Debtor Entities are matters for another day. The law firm's duty is to investigate and help each Debtor Entity maximize its estate. Debtors' contention in the motions for joint representation that they would forego collection of the intercompany debt is not reassuring—each estate must do what is best for each estate, and that decision must be reached after a full and fair analysis. The Court concludes the *Roberts* definition for representation of an adverse interest is met in these cases. Hinkle, in representing the three Debtor Entities, would be representing adverse interests.

Hinkle proposes the use of conflict counsel for review of any claims the Debtor Entities may have against another. Through the use of conflicts counsel:

> "[I]f conflict matters—matters in which general bankruptcy counsel's simultaneous representation of more than one debtor would pose a disqualifying conflict of interest—are carved out of the scope of general bankruptcy counsel's representation of the debtors, and are assigned to separate independent counsel, no actual conflict of interest can arise on the part of general bankruptcy counsel. The conflict matters are outside the scope of its representation."[67]

---

[66] *Id.* p. 15.
[67] *In re WM Distrib., Inc.*, 571 B.R. 866, 873 (Bankr. D.N.M. 2017).

28

There are situations where the use of conflicts counsel may be appropriate,[68] and certainly the Tenth Circuit has noted the "simultaneous representation of related estates in bankruptcy" is not "per se prohibited."[69] But the use of conflicts counsel is *not* appropriate when "the adverse interests of the debtors represented by the same general bankruptcy counsel are central to the reorganization efforts of either debtor or to other resolutions of the chapter 11 case or where the adverse interests are so extensive that each debtor should have its own independent general bankruptcy counsel."[70]

Here, the transfers made between the Debtor Entities are certainly central to the related litigation involving the Debtor Entities and are extensive enough even within the reorganization efforts of each bankruptcy estate that attempting to "cure" the conflicts the law firm would encounter with the use of conflicts counsel would not fix the problems identified by single representation.

In addition, Mr. Samy's transfer of funds to Hinkle for the benefit of Samys OC, LLC, S&O Investments, Inc., and American Warrior Construction, Inc.—i.e., the retainer for the payment of those three entities' legal fees—is cause for concern. If the transfer is avoided, the law firm or the Debtor Entities may be liable as transferees under § 550. Again, this potential liability would cause the law firm to hold an adverse interest to the estates of the Debtor Entities when allocating any

---

[68] The Tenth Circuit in *Interwest* did not consider the use of conflicts counsel, as the issue was not before it. As a result, the Tenth Circuit has not foreclosed the use of an independent conflict counsel to represent a debtor in a matter for which the debtor's general counsel would otherwise have a conflict or hold or represent an adverse interest.
[69] *In re Interwest Bus. Equip., Inc*, 23 F. 3d at 318-19.
[70] *In re WM Distrib., Inc.*, 571 B.R. at 873.

liability for the transfer. This is another source of the firm's lack of disinterestedness.

There is no doubt that Chapter 11 debtors who are business entities have different considerations when assessing employment than an individual debtor seeking representation in a simple reorganization or liquidation. The Code recognizes as much, in § 1107(b), where it states: "a person is not disqualified for employment under section 327 . . . solely because of such person's employment by or representation of the debtor before the commencement of the case." But here, despite this additional latitude given a Chapter 11 debtor, the Court concludes Hinkle is not qualified under § 327(a) due to the central nature and extensiveness of the adverse interests and a lack of disinterestedness.

### f.  Conflicts under § 327(c)

The Court next addresses the hurdle to employment of counsel of § 327(c). Section 327(c) states "a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest." Here, Hinkle is attempting to represent the Debtor Entities, which are creditors of each other, and there is an objection to that representation by both the U.S. Trustee and another creditor. Therefore, the Court must make a finding whether the law firm will hold an actual conflict of interest through its representation of creditors.

Conflicts of interest under § 327(c) are again not defined by the Code. Other bankruptcy courts have concluded an "'actual conflict exists if there is an active competition between two interests, in which one interest can only be served at the expense of the other.'"[71] Again, the Court need not deal in certainties: counsel employed under § 327 must be "free of any conflicting interest which *might* . . . affect the performance of their services or which *might* impair the high degree of impartiality and detached judgment expected of them during the administration of a case."[72]

Again, Hinkle's representation of the Debtor Entities would require that law firm to simultaneously represent current creditors of each other. For example, Samys OC, LLC and S&O Investments, Inc. may have avoidance claims against American Warrior Construction, Inc. The law firm would have to both prosecute and defend such claims against the other and would necessarily have an actual conflict of interest in that representation of each bankruptcy estate. There is an actual conflict of interest—an "'active competition between two interests, in which one interest can only be served at the expense of the other'"[73]—under § 327(c).

Under KRPC 1.7(a), "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Hinkle has argued Mr. Samy, as entity representative, would waive any conflict of interest that could arise from the firm's representation of another Debtor. Under KRPB 1.7(b)(4), an

---

[71] *In re 7677 E. Berry Ave. Assocs., L.P.*, 419 B.R. 833, 842 (Bankr. D. Colo. 2009) (quoting *In re Git-N-Go, Inc.*, 321 B.R. at 58).
[72] *Id.* at 843 (internal quotations omitted) (emphasis added).
[73] *Id.* at 842 (quoting *In re Git-N-Go, Inc.*, 321 B.R. at 58).

impacted client can give informed consent and waive the conflict. But under KRPC 1.7(b)(3), even a waiver is not acceptable when the concurrent representation involves assertion of claims "by one client against another client" in the "same litigation or other proceeding." Therefore, under KRPB 1.7, one firm cannot represent one client (a Debtor Entity) in a claim against another client (another Debtor Entity) *in the same proceeding*, regardless of a waiver.[74]

Further, the Court cannot ignore the law firm's entanglement with Mr. Samy related to all the Debtor Entities' estates. Mr. Samy, a creditor of some of the Debtor Entities, testified he had confidential communications with the law firm about the claims against each of the Debtor Entities. Mr. Samy also testified he believed those communications to be protected by his attorney-client privilege, and the law firm should not use information from those communications against the Samys individually. The Samys are now former clients of Hinkle, but current creditors against some of the Debtor Entities Hinkle seeks to represent. As detailed above, there were multiple debts and transfers between the Debtor Entities and the Samys individually, including the Debtor Entities (in particular, Samys OC, LLC and American Warrior Construction, Inc.) owing money to the Samys and the Samys owing money or transferring money to the Debtor Entities (Mr. Samy owes

---

[74] Cairo argues Hinkle also has a conflict of interest under KRPC 1.7 due to its prior representation of the Samys, because the firm cannot convert the Samys from current clients to former clients by terminating the relationship in order avoid the absolute prohibition under KRPC 1.7 resulting from a concurrent conflict, citing *Matter of Hodge*, 407 P.3d 613 (Kan. 2017). The holding of *Hodge* is not quite that severe, as that case actually holds a lawyer cannot convert a client from a current client to a former client to fall outside the requirements of KRPC 1.7 *with a "unilateral (and failed) attempt to terminate the attorney-client relationship." Id.* at 644 (emphasis added). Here, the termination of the attorney-client relationship between the law firm and the Samys is not unilateral and was not a failed attempt.

Samys OC, LLC, received money from Samys OC, LLC, and transferred money prepetition to American Warrior Construction, Inc.).[75] This is another complicating factor supporting the Court's exercise of its discretion to deny the Applications to Employ.

### g. Conflict of Interest under the KRPC

The remaining issue raised by Cairo is Hinkle's alleged conflict of interest under the Kansas Rules of Professional Conduct due to the firm's employment of Ms. Stevens. The text of KRPC 1.9(a) is set out above, but as applied to this situation it would read:

> A lawyer [the Hinkle Law Firm, through Ms. Stevens] who has formerly represented a client [Cairo] in a matter [the state court litigation between Cairo and American Warrior Construction, Inc., with Samys OC, LLC and S&O Investments, Inc. named as nominal defendants— i.e, the Unified case] shall not thereafter represent another person [the Debtor Entities] in the same or substantially related matter in which that person's [the Debtor Entities'] interests are materially adverse to the interests of the former client [Cairo] unless the former client [Cairo] gives informed consent, confirmed in writing.

KRPC 1.9(a) applies because of KRPC 1.10(a), which dictates when lawyers are associated at a firm (here, Hinkle), none of them may represent a client when any one of them (here, allegedly Ms. Stevens) would be prohibited from doing so under KRPC 1.9.

Cairo established at the hearing that Ms. Stevens obtained "material and confidential" information from Cairo.[76] The testimony from Mr. Swender and Mr.

---

[75] *See supra* note 21.
[76] *See Koch v. Koch Indus.*, 798 F. Supp. 1525, 1537 (D. Kan. 1992) ("Doubts as to whether a substantial relationship exists should be resolved in favor of disqualification.").

33

Jackson detailed above established Ms. Stevens was present and involved while attorney-client privileged information was discussed. Ms. Stevens helped prepare for the mediation in the Unified case, attended that mediation with Mr. Jackson and Mr. Swender, and was present for discussions with the mediator about the position held by Cairo in that litigation. The fact Ms. Stevens was not a lawyer at the time is immaterial.[77] The fact Ms. Stevens does not remember any confidential information is also immaterial.[78]

It is also clear the Debtor Entities and Cairo have materially adverse interests. The remaining question is whether the state court litigation in which Ms. Stevens obtained privileged information is "substantially related" to the bankruptcy cases of the Debtor Entities. Comment 3 to KRPC 1.9 defines "substantially related" as follows:

> "Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter. . . . Information that has been disclosed to the public or to other parties adverse to the former client ordinarily will not be disqualifying. Information acquired in a prior representation may have been rendered obsolete by the passage of time, a circumstance that may be relevant in determining whether two representations are substantially related. In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior

---

[77] *Zimmerman v. Mahaska Bottling Co.*, 19 P.3d 784, 817 (Kan. 2001) (holding the imputation of conflicts rules of the KRPC apply to nonlawyer staff). Hinkle agreed at the evidentiary hearing on this matter that Ms. Stevens is subject to the Kansas Rules of Professional Conduct.
[78] *Koch*, 798 F. Supp. at 1537 ("The court need not inquire into whether the confidential information was actually revealed or whether the attorney would be likely to use the information to the disadvantage of the former client.").

34

representation that are relevant to the matter in question ordinarily will preclude such a representation."

The exact extent of the litigation of claims that will be required between the Debtor Entities and Cairo is of course unknown. But even at this early stage in the bankruptcy cases of the Debtor Entities the Court is aware there will be numerous claims made between them, some likely stemming from that very same state court litigation (the Unified case) for which Ms. Stevens prepared for and attended a mediation. Hinkle argues the reorganization process is different than the adversary process, wherein the Unified case will ultimately be concluded, but that is threading too thin a needle. The resolution of claims is the very epitome of the reorganization process: assessing those claims, objecting to the claims, making a plan for the payment of claims. The litigation of the claims these parties have against each other is vital—and "substantially related"—to reorganization of the Debtor Entities.

Hinkle also points out the Model Rules of the American Bar Association permit a screening remedy that could cure this conflict,[79] and the Letter Agreement itself contemplated a screening remedy.[80] The law firm asserts it would use screening to ensure Ms. Stevens is completely closed off from the representation of the Debtor Entities. But Hinkle also recognizes the KRPC do *not* permit such a

---

[79] *See* American Bar Association Model Rules of Professional Conduct, Model Rule 1.10 (permitting screening in described situations when prescribed procedural requirements are met).
[80] Debtors' Ex. 1 p. 2 (describing the "safeguards" the law firm would employ to screen Ms. Stevens from the Foundation litigation).

35

screening remedy,[81] and as noted above, it is the KRPC that govern attorneys practicing in this Court.[82]

There is no evidence Ms. Stevens or Hinkle breached any confidence of any of the O'Brate entities. The Jackson Legal Group admirably gave a college student an opportunity to explore the legal world before deciding to commit to law school. Given the timing of Ms. Stevens's employment as an attorney by Hinkle years later and the quick-file nature of the bankruptcies of the Debtor Entities, it is understandable how this situation developed. At the hearing, Cairo made it clear it is not accusing Hinkle or Ms. Stevens of any intent to harm Cairo's interests. Likewise, this Court makes no such finding. However, the Court concludes KPRC 1.9 and 1.10, as applied to the facts of this case, create a situation that would prohibit Hinkle from prospectively representing the Debtor Entities in these bankruptcies.

### III.  Conclusion

This Court "has an independent duty to inquire into the qualifications of counsel for debtor in possession."[83] Although it appears there was only a short time frame in which to explore the potential problems with a single law firm as counsel, the weight of the record clearly shows Hinkle has not carried its burden to show it is

---

[81] *See Zimmerman*, 19 P.3d at 793 ("Screening devices, however, are prohibited under the KRPC. There is no provision or exception which allows them for lawyers.")

[82] D. Kan. LBR 2090.2; D. Kan. Rule 83.6.1.

[83] *In re Git-N-Go, Inc.*, 321 B.R. 54, 59 (Bankr. N.D. Okla. 2004); *In re Interwest Bus. Equip., Inc.*, 23 F.3d 311, 317 (10th Cir. 1994) ("a bankruptcy court has the authority and responsibility to only approve employment of professionals who meet the minimum requirements set forth in § 327(a), independent of objections").

36

qualified under § 327 or free from conflicts under the KRPC. As a result, the Applications to Employ are denied.

**It is so Ordered.**

### # # #